UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIE CECILIA SULLIVAN, Plaintiff, v. COMMISSIONER OF SOCIAL SECURITY, Defendant. | Case No.16-cv-06233-HRL **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** Re: Dkt. Nos. 21, 27 |

Plaintiff Julie Sullivan ("Sullivan") appeals a final decision by the Commissioner of the Social Security Administration ("the Commissioner"), who denied her application for disability insurance benefits under Title II of the Social Security Act. The parties make cross-motions for summary judgment. For the reasons set forth below, Sullivan's motion is denied and the Commissioner's motion is granted.

**I.  BACKGROUND**

**A.  Medical History**

Sullivan was born in 1980. She completed some college and is certified as a medical assistant. AR 44. She worked for a few months at a supermarket bagging groceries, but spent most of her career as a medical assistant. AR 179. She has not worked since 2013. *Id.*

Sullivan has reported "severe, constant" pain in her neck, shoulders, and elsewhere for more than ten years. AR 187. In 2012, she underwent an anterior cervical discectomy and fusion (ACDF) at vertebrae C5-6. AR 369. She continued to experience pain after the surgery, but her neurologist, Dr. Mark Anderson, could find "no neurological evidence of causation of her symptomology." *Id.* He recommended that Sullivan take anti-inflammatories, and concluded that she was not a candidate for future operative intervention. *Id.*

Sullivan's pain persisted. About one year after the ACDF procedure, Dr. M. Michael Mahdad, a neurologist, identified "mild neurogenic changes" at the C4-5 vertebrae level. AR 255. These changes were suggestive of "VERY MILD RIGHT C4/5 RADICULOPATHY, mostly chronic in nature[.]" *Id.* In June 2013, Sullivan was in a car collision, which further aggravated her cervical spine pain. Her neurosurgeon noted that she was uniquely susceptible to injury from a car crash, but he nonetheless recommended limited treatment, consisting of nerve-blocking drugs and application of an external bone stimulator. AR 304-305, 327, 348.

In August 2014, Dr. John Johnson, a neurological surgeon, identified "marked hypermobility" at the C6-7 vertebrae. AR 535. He recommended that Sullivan undergo another ACDF, this time at the C6-7 level, though he also thought that insertion of an artificial disc might work in light of Sullivan's age and her "minimal amount of degenerative changes." *Id.* About a month later, Dr. Mark Harwood examined Sullivan and, in contrast to Dr. Johnson, he did not observe any hypermobility at C6-7. AR 542. Dr. Harwood, an orthopedic surgeon, said that he "strongly favor[ed]" a disc replacement over another ACDF. *Id.*

In November 2014, Dr. James Avery diagnosed Sullivan with thoracic outlet syndrome and myofascial pain syndrome. AR 566. Dr. Avery recommended a "conservative treatment" based largely on physical therapy. AR 567. The following month, Sullivan reported that scapular manipulation, a physical therapy technique, was providing significant pain reduction. AR 574. Thanks to the treatment, she told Dr. Avery, she felt reduced pressure in her neck and shoulder, and was able to sleep better. *Id.*

In addition to her cervical spine issues, Sullivan complained of migraine headaches, and was diagnosed with an anxiety disorder. AR 244-45. Sullivan's medical records contain only scattered references to both issues, and there are no records of her receiving consistent mental health treatment. In February 2013, Dr. Peter DeSilva reported that Sullivan exhibited poor insight and judgment, and an inappropriate mood or affect. AR 244. In addition, Sullivan's longtime partner reported that Sullivan was experiencing decreased self-esteem and increased stress. AR 207-211. However, on a separate occasion (also in February 2013), Dr. DeSilva reported that Sullivan's mood and affect were normal. AR 246. Around the same time, a different

2

doctor noted that Sullivan did not exhibit any signs of anxiety or depression at all. AR 299. The psychological consultant who reviewed Sullivan's benefits application concluded that, although Sullivan experienced some limitations related to anxiety, any mental impairment was a secondary characteristic of her physical pain symptoms. AR 57.

### B. Procedural History

Sullivan applied for Title II benefits in April 2013. AR 133. The Commissioner denied Sullivan's application initially and on reconsideration, and Sullivan requested a hearing before an administrative law judge ("ALJ"). AR 90. ALJ Christopher R. Inama presided over a hearing in February 2015. AR 30.

At the hearing, Sullivan testified that she experienced severe limitations from her cervical spine impairments and her headaches. For example, she reported that she had difficulty lifting even a glass of water, and said that her headaches sometimes lasted for days at a time. AR 39-41. Her testimony echoed claims she previously made in questionnaires, where she explained that her pain made it difficult for her to perform daily chores. AR 189-96. That said, Sullivan also reported in a questionnaire that she accompanied her partner on shopping trips, was still able to drive a car short distances, and had no problems getting along with family, friends, or neighbors. *Id.*

The ALJ issued a written decision in May 2015. AR 11. In his written decision, the ALJ considered Sullivan's claim of disability with the five-step, sequential evaluation approach that is required by the Commissioner's regulations. *See* 20 C.F.R. § 404.1520. At step one, the ALJ found that Sullivan had not performed substantial gainful activity since the alleged onset date of her disability (February 2013). AR 16. At step two, the ALJ found that Sullivan had two impairments that qualified as severe: (1) degenerative disc disease of the cervical spine, specifically at the C5-6 vertebrae; and (2) migraine headaches. The ALJ concluded that Sullivan's more recent cervical spine impairments were not severe. The ALJ pointed out that there was no clear diagnosis yet as to whether Sullivan had hypermobility at C6-7, and that Sullivan had not undergone any of the recommended procedures. AR 16-17. Separately, the ALJ determined that Sullivan's November 2014 diagnoses for thoracic outlet syndrome and myofascial pain syndrome

did not meet the twelve-month durational requirement for an impairment to qualify as severe. AR 17.

In performing the step-two analysis, the ALJ noted that some of Sullivan's treating physicians had submitted questionnaires, in which the doctors offered their opinions as to Sullivan's ability to work. Most notably, the ALJ discussed questionnaires submitted by Dr. Marni Friedman, a family practice specialist. Dr. Friedman estimated that Sullivan could not sit for more than five minutes at a time, could not stand for more than ten minutes at a time, and that she would miss more than four days of work per month. AR 521. However, Dr. Friedman reported that she had only met with Sullivan four times over a two-month period in 2014. AR 517. On that basis, the ALJ discounted Dr. Friedman's opinion, arguing that the short span of the treatment relationship meant that Dr. Friedman did not have a "longitudinal picture of [Sullivan's] medical condition." AR 17. The ALJ also argued that Dr. Friedman's opinion pertained only to the most recent diagnoses, which the ALJ had already determined did not meet the twelve-month durational requirement. AR 17.

Finally, as part of step two, the ALJ concluded that Sullivan's anxiety disorder did not qualify as severe. AR 18- 19. The ALJ noted that Sullivan reported having no difficulty interacting with others, AR 18, and accorded significant weight to the psychiatric consultant's opinion that Sullivan's anxiety was both non-severe and secondary to her physical pain symptoms. AR 18-19.

At step three, the ALJ determined that none of Sullivan's severe impairments or combinations thereof met or was medically equal to the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ found that Sullivan had a residual functional capacity ("RFC") to perform "light work, as defined in 20 CFR § 404.1567(b)," with some exceptions as to her movements. AR 20. In doing so, the ALJ considered all of Sullivan's alleged impairments, including the more recent, non-severe cervical spine issues. AR 20-23. The ALJ ultimately concluded that, based on her RFC, Sullivan could perform her past relevant work as a medical assistant. AR 23-24. Having determined that Sullivan could perform her past relevant work, and

4

1  that she was therefore not disabled, the ALJ did not proceed to step five of the sequential
2  evaluation.
3  The Appeals Council denied Sullivan's request to review the ALJ's decision, AR 1-5, and
4  Sullivan sought judicial review in this Court. Dkt. No. 1.
5  All parties consented to magistrate judge jurisdiction. Dkt. Nos. 8,9.

## II.  LEGAL STANDARD

This Court has jurisdiction to review the Commissioner's decision to deny benefits, but must affirm if the Commissioner's decision applies the correct legal standards and is supported by substantial evidence. *See* 42 U.S.C. § 405(g) ("findings of the Commissioner ... as to any fact, if supported by substantial evidence, shall be conclusive"); *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and is "more than a mere scintilla, but may be less than a preponderance." *Molina*, 674 F.3d. at 1110-11 (citations omitted). A court must consider the record as a whole when assessing whether the Commissioner's decision is supported by substantial evidence. *See Howard v. Heckler*, 782 F.2d 1484, 1487 (9th Cir. 1986). "If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

## III.  DISCUSSION

Sullivan raises three arguments for why the Commissioner's decision should be reversed: (1) the ALJ improperly discounted the opinion of Dr. Friedman; (2) the ALJ erred in classifying the more recent cervical spine impairments as non-severe; and (3) the ALJ wrongly concluded that Sullivan's mental impairment was not severe.

### A.  Dr. Friedman

First, Sullivan argues that the ALJ erred in discounting the opinion of Dr. Friedman. *See* Dkt. No. 21 at 10-12.

When evaluating medical evidence, an ALJ must give a treating physician's opinion "substantial weight." *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir.

2009). When a treating physician's opinion is well-supported and not inconsistent with other substantial evidence in the record, a treating physician's opinion is entitled to controlling weight. *See Edlund*, 253 F.3d at 1157; 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. Even if the treating doctor's opinion is contradicted by other evidence, an ALJ may reject the opinion of a treating doctor only for "specific and legitimate reasons that are supported by substantial evidence in the record." *Edlund*, 253 F.3d at 1157. When discounting the opinion of a treating doctor, an ALJ must weigh factors such as the length of the treatment relationship, and whether the treating doctor's opinion is supported by objective medical tests. *See* 20 C.F.R. § 404.1527(c)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.").

Here, Sullivan argues that the ALJ erred in discounting Dr. Friedman's opinion because Dr. Friedman had only seen Sullivan four times over a two-month period. This argument is without merit. The length of the treatment relationship is a legitimate, enumerated factor that ALJs must consider when evaluating a medical opinion. *See* 20 C.F.R. § 404.1527(c)(i). Sullivan points to *Le v. Astrue*, 529, F.3d 1200 (9th Cir. 2008), and *Ghokassian v. Shalala*, 41 F.3d 1300 (9th Cir. 1994), to suggest that Dr. Friedman's opinion should have been accorded more weight, but neither case supports her argument. In *Le*, the issue was whether the Commissioner had unreasonably argued that a doctor, who saw the claimant five times over three years, did not qualify as a treating physician. Here, by contrast, the ALJ did not contest that Dr. Friedman was Sullivan's treating doctor. Instead, the ALJ pointed to the short treatment relationship as one reason to discount Dr. Friedman's opinion. AR 17. In addition, whereas the doctor at issue in *Le* treated the claimant for three years, Dr. Friedman's opinion was based on a treatment relationship that had lasted only two months. It was reasonable for the ALJ to conclude that, unlike the doctor in *Le*, Dr. Friedman did not have a "longitudinal picture" of Sullivan's condition, and to discount Dr. Friedman's opinion on that basis. As to *Ghokassian*, the Ninth Circuit concluded that the ALJ in that case failed to articulate specific and legitimate reasons to discount the treating doctor's opinion. *See* 41 F.3d at 1303. As already discussed, that is not the case here.

6

Finally, Sullivan argues that the ALJ's improperly discounted Dr. Friedman's opinion because, although Dr. Friedman observed only Sullivan's most recent impairments, Dr. Friedman's diagnoses "harmonize[d] with all the severe neck impairments" that Sullivan previously reported. Dkt. No. 21 at 10-11. This seems to be less of an argument about whether the ALJ properly considered Dr. Friedman's opinion, and more of an argument about whether the ALJ erred in determining that Sullivan's post-2012 cervical spine impairments were not severe. The latter question is addressed below.

### B. Sullivan's Physical Impairments

Sullivan disagrees with the ALJ's conclusion that all of her physical ailments (except for the degenerative disc disease and the migraines) were non-severe. In particular, Sullivan seems to argue that the ALJ erred in concluding that Sullivan's thoracic outlet syndrome and myofascial pain syndrome had not lasted for the required twelve months. She points to Social Security Ruling 83-20, which notes that it may be possible to "reasonably infer that the onset" of an impairment occurred some time prior to any formal medical diagnosis. Sullivan argues that there was "plenty of medical evidence that connects" her older impairments to her more recent diagnoses. Dkt. No. 21 at 13.

At step two of the sequential evaluation approach, the ALJ must determine whether the claimant has any "severe medically determinable physical or mental impairment[s.]" 20 C.F.R. § 404.1520(a)(4)(ii). Unless an impairment is expected to result in death, it must have lasted or be expected to last for at least twelve consecutive months to qualify as severe. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). In steps one through four of the sequential evaluation, the burden is on the claimant to prove that she is disabled. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005).

Here, substantial evidence supported the ALJ's conclusion that the more recent (post-2012 surgery) impairments were not severe. Dr. Mahdad identified only "mild neurogenic changes" at the C4-5 vertebrae level in 2013, AR 255, and Sullivan had not yet received a clear diagnosis as to potential hypermobility at C6-7. AR 16-17. Even after the 2013 car crash, Sullivan's doctor recommended only nerve-blockers and an external bone stimulator. AR 304-305, 327, 348. As to

7

1   the November 2014 diagnoses, Sullivan is correct that an ALJ is not bound to accept the diagnosis
2   date as the onset date for the purpose of determining benefits eligibility.  The record showed,
3   however, that Sullivan experienced significant pain reduction from physical therapy.  AR 17.
4   Accordingly, even if the ALJ erred in identifying the onset date of Sullivan's thoracic outlet
5   syndrome and myofascial pain syndrome, the medical evidence supported the ALJ's conclusion
6   that neither condition was severe.

### C.     Sullivan's Mental Impairments

The argument section of Sullivan's summary judgment motion begins with the headline: "THE ALJ'S FINDING OF A NON-SEVERE MENTAL IMPAIRMENT DOES NOT WITHSTAND MINIMAL SCRUTINY."  Dkt. No. 21 at 8.  Sullivan never mentioned the issue of her alleged mental impairments again, either in her motion or her reply to the Commissioner's cross-motion.  The Court nevertheless addresses the issue, and rejects Sullivan's argument.

Evaluating the severity of an alleged mental impairment requires a special technique.  *See* 20 C.F.R. § 404.1520a.  If the claimant has a medically determinable mental impairment, the ALJ will rate the degree to which the impairment impedes the claimant's functioning in four broad areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  *See Hoopai v. Astrue*, 499 F.3d 1071, 1077-78 (9th Cir. 2007); 20 C.F.R. §§ 1520a(c)(3), (4).  If the ALJ concludes that the impairment causes no more than mild limitations in the four broad areas, then, absent other evidence, the ALJ will generally conclude that the impairment is not severe.  *See* 20 C.F.R. § 1520a(d)(1).

Here, Sullivan did not formally allege disability on the basis of a mental impairment, AR 56, but the ALJ addressed the issue anyway.  The ALJ evaluated Sullivan's anxiety disorder using the special technique, and found that Sullivan had no more than mild limitations in the first three broad functional areas.  AR 18-19.  He noted that there was no evidence of any extended episodes of decompensation.  *Id.*  The ALJ's conclusions were supported by the fact that, despite occasional reports of emotional distress and low-self esteem, Sullivan's doctors generally described her as exhibiting normal behavior.  *Id.*  The ALJ also drew on Sullivan's own report that she was able to interact with others without difficulty.  *Id.*  The ALJ's conclusion as to Sullivan's mental

8

impairment was supported by substantial evidence.

**IV. CONCLUSION**

Based on the foregoing, Sullivan's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted.

**IT IS SO ORDERED.**

Dated: November 1, 2017

HOWARD R. LLOYD
United States Magistrate Judge